NEW JERSEY PROTECTION AND ADVOCACY, INC.
BY:  WILLIAM EMMETT DWYER, ESQ. (WD 6894)
     HELEN C. DODICK, ESQ. (HD 4960)
210 SOUTH BROAD STREET, 3RD FLOOR
TRENTON, NEW JERSEY  08608
(609) 292-9742
Attorney for Plaintiff

**RECEIVED**

APR  5 2005

AT 8:30 _____.M
WILLIAM T. WALSH
CLERK

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

NEW JERSEY PROTECTION AND ADVOCACY,
INC., a New Jersey non-profit corporation;

    Plaintiff,

v.

JAMES DAVY, In his Official Capacity as
Commissioner of Human Services for the State of
New Jersey,

    Defendant.

Civil Action No. 05-1784 (SRC)

COMPLAINT

## PRELIMINARY STATEMENT

Every day, hundreds of individuals are unnecessarily and illegally confined in New Jersey's state psychiatric hospitals.  These individuals no longer require inpatient care and treatment.  The only reason they continue to be confined and are not living in the community is because the defendant has failed to develop suitable community living placements and programs for their release back into their communities.

The failure to release people who no longer require hospitalization has gone on for over a quarter of a century in New Jersey. The Defendant was sued in the early 1980's on behalf of several patients seeking release from continued unnecessary confinement. *In re S.L.*, 94 N.J. 128 (1983). At that time, Defendant argued that even though the individuals seeking discharge no longer met the legal standards for commitment, it would be cruel to release such individuals because there were no discharge plans or available community placements. However, keeping those individuals hospitalized posed a problem, as there was no legal basis for keeping such persons confined.

In an effort to prevent the abandonment of psychiatric patients by the state, the New Jersey Supreme Court found legal authority for keeping persons confined to the state's psychiatric hospitals when they no longer required inpatient treatment. The court articulated this legal authority in the case *In re S.L.*, 94 N.J. 128 (1983). In that case, the court determined that the state's *parens patriae* power was sufficient to continue the confinement of individuals in state hospitals and maintain their segregation from the community at large. *S.L.* gave rise to what is known as "Conditional Extension Pending Placement" ("CEPP").

CEPP status was designed to provide the state with time to develop an appropriate community placement before discharging a patient while simultaneously protecting the patient's due process rights. A person can be placed on CEPP status at a review hearing if the judge finds the individual entitled to discharge but an appropriate placement is not available. The procedure is set forth in New Jersey *R.* 4:74-7(h)(2).

2

Unfortunately, the Defendant has egregiously misused CEPP status to retain staggering numbers of individuals in locked and dangerous facilities when they have a right to reside in and receive mental health services in the community.

Today, CEPP status would not be necessary at all if the Defendant's predecessors over the past twenty-five years had developed community placements and initiated timely discharge planning for patients deemed no longer in need of hospitalization. Rather than develop the community programs and placements these individuals need, the State instead has allowed them to languish in confinement far beyond the reasonable expectation for any CEPP status.

This case is about compelling the Defendant to develop and provide community placements for individuals in state psychiatric hospitals, individuals who have been adjudicated as no longer meeting the standards for civil commitment.

## THE PARTIES

1.    Plaintiff New Jersey Protection & Advocacy, Inc. ("NJP&A" or "Plaintiff"), a non-profit corporation, is the federally funded agency designated to serve as New Jersey's protection and advocacy system for people with disabilities. Pursuant to this designation, NJP&A serves as the agency to implement, on behalf of the State of New Jersey, the Protection and Advocacy System for Individuals with Mental Illness established under 42 U.S.C §§ 10801-10807. [NJP&A has served in this capacity since 1994.]

3

2.     NJP&A is part of a nationwide network of protection and advocacy agencies located in all fifty states, the District of Columbia, Puerto Rico, and the federal territories. The protection and advocacy system comprises the nation's largest provider of legally based advocacy services for people with disabilities.

3.     NJP&A has statutory authority to pursue legal, administrative and other appropriate remedies to ensure the protection of individuals with mental illness who are or will be receiving care and treatment in New Jersey pursuant to the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. § 10801 et seq.

4.     NJP&A is pursuing this action to protect and advocate for the rights and interests of "individuals with mental illness" as that term is defined in 42 U.S.C. § 10802. Specifically, NJP&A brings this action on behalf of individuals with mental illness who are confined to state psychiatric hospitals within New Jersey whom a court of this State has adjudicated as no longer meeting the statutory requirement for involuntary commitment to a state psychiatric hospital.

5.     These individuals have each suffered injuries, or will suffer such injuries, that would allow them to bring suit against Defendants in their own right.

6.     Defendant James Davy is Commissioner of the Department of Human Services of New Jersey ("DHS"), a public entity covered by, *inter alia*, Title II of the Americans with Disabilities Act ("ADA"). 42 U.S.C. § 12131(1).

4

7.    Defendant Davy is ultimately responsible for ensuring that New Jersey operates its service systems in conformity with the constitutions of the United States and New Jersey and with the ADA and Section 504 of the Rehabilitation Act ("Section 504"). He is sued in his official capacity.

8.    DHS also operates state inpatient psychiatric facilities and is responsible for discharge planning, placement, and follow up for individuals residing in such facilities.

9.    DHS is the recipient of federal funds and administers state mental health programs.

## JURISDICTION

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (for civil actions arising under the laws of the United States), jurisdiction under 28 U.S.C. § 1343(a)(3)&(4) (for actions under laws providing for the protection of civil rights), and supplemental jurisdiction under 28 U.S.C. § 1367 (for pendant state claims).

11.    Plaintiff seeks declaratory and injunctive relief under 28 U.S.C. § 2201 *et seq.*

## FACTS

### A. The Origin of Conditional Extension Pending Placement

12.    The New Jersey Supreme Court created the status of Conditional Extension Pending Placement (CEPP) in 1983 in the case *In re S.L.*, 94 N.J. 128 (1983). At that time, the Task

Force on Mental Commitments ("Task Force") had been formed to suggest an appropriate way to treat institutionalized individuals who no longer met the commitment standard. *Id.* at 134. The Task Force recommended development of an intermediate standard of commitment that would cover "an individual who by reason of mental illness is unable to care for himself without some level of aid or supervision." *Id.* at 139.

13.     The New Jersey Supreme Court specifically declined to develop such an intermediate standard. *Id.* Rather, it recognized such continued commitment as being a violation of an individual's due process rights and, therefore, found that the state could not keep non-dangerous individuals on committed status using its police powers. *Id.*

14.     The court recognized, however, that in accordance with its *parens patriae* responsibility, it could not "cast [patients] adrift into the community when the individuals are incapable of survival on their own." *Id.* at 140. The court held that the state "may therefore continue the confinement of such persons on a provisional or conditional basis to protect their essential well being pending efforts to foster placement of these individuals in proper supportive settings outside of the institution." *Id.*

15.     The court set forth strict procedural requirements for continued commitment under these circumstances. Of significance is the requirement of an initial placement review hearing within sixty days of the entry of an order of CEPP. *Id.* Thereafter, subsequent placement review hearings must occur at least every six months. *Id.* at 141.

6

16. If placement is not possible, the court must determine whether the state has undertaken all good faith efforts necessary to place the individual in an appropriate setting outside of the psychiatric institution. *Id.*

17. At each of the placement review hearings, the state must show what efforts it has made to locate placement for the individual. If immediate placement is not possible, the court must determine if the state has undertaken all good faith efforts to ensure that the individual is placed in an environment least restrictive of his or her liberty within the institution. *Id.* at 141.

18. While the individual remains confined in the institution, all reasonable efforts must be made to improve the individual's ability to function in a community-based setting. *Id.*

19. Only under these limited and strict conditions is "the continuing confinement of individuals who do not meet standards for commitment and are eligible for discharge but are not able to survive independently . . . in accord with due process." *Id.* at 142.

20. The Plaintiff does not allege that CEPP status is illegal; rather the Plaintiff alleges that the Defendant's practice and application of CEPP status runs afoul of his obligations under the ADA to comply with the landmark United States Supreme Court decision, *Olmstead v. L.C.*, 527 U.S. 581 (1999).

## B. The Reality of Conditional Extension Pending Placement

21.    The state has misused CEPP status to justify the continued confinement of thousands of individuals while simultaneously failing to develop suitable community supports for those individuals.

22.    Every person on CEPP status bears the stigma inherent in being unnecessarily segregated from other citizens in the community.

23.    The narrowly tailored due process protections of CEPP status, designed to permit hospitals to continue the confinement of individuals while the state develops a community placement, now serves as the very sword against the individuals it was designed to shield.

24.    Excluding the state's lone forensic hospital, on any given day nearly 50% of the individuals in New Jersey's psychiatric hospitals are on CEPP status.  In other words, nearly half of the people who are institutionalized in New Jersey's psychiatric hospitals have been determined by a court to no longer require such institutionalized care.

25.    While on CEPP status these individuals are routinely housed in the most restrictive part of the institution despite being viewed as ready to return to the community.  These wards also contain the most volatile patients, including those who are on committed status and often have not yet been stabilized.

26. The CEPP population remains on the most restrictive wards because of the lack of space in less restrictive parts of the hospitals such as cottages where greater freedoms in a comparatively more community-like setting are permitted.

27. There are few openings in cottages because the state has failed to move the cottage residents into the community. Consequently, no opportunity exists for other CEPP individuals in the hospitals' more restrictive wards to move from those wards into the cottages or other less restrictive placements in the hospital.

28. CEPP patients residing on overcrowded and understaffed wards are routinely subject to abuse and neglect and frequently victims of assault from more volatile patients, many of whom are on committed status because they are a danger to themselves or others.

29. While remaining on restrictive and volatile hospital wards, CEPP patients routinely receive the same treatment by staff as involuntarily committed patients. For example, staff continues to grant and rescind privilege levels that determine whether or not the CEPP individual will be entitled to go outside on the grounds of the hospital, attend social activities, and use the library or other hospital facilities. It does not matter that a judge has determined that the individual no longer even needs to be hospitalized; a CEPP patient may not go outside for fresh air unless a staff member permits it.

30. Despite being adjudicated as ready for community placement, individuals on CEPP status live under the same constant threat of forced medication as those on committed status because

9

the staff does not differentiate between those individuals on CEPP and those who are on committed status.

31.    Despite being adjudicated as ready for community placement, individuals on CEPP status live with the constant threat of restraints and isolation if they become upset, despairing or display frustration or anger at their continued confinement, a threat not faced by those on non-CEPP status living in the community.

32.    While on CEPP status and confined to state hospitals, those individuals for whom intensive therapy is indicated are unable to receive such therapy because, apart from psychotropic medication, very limited therapy is offered in state psychiatric hospitals, even for conditions for which therapy, and not medication, is the recommended treatment.

33.    Despite being adjudicated as ready for community living, the individuals on CEPP status who are confined to institutions remain on locked wards without the ability to control simple events in their life such as turning lights on or off, when they will lie down to rest, when they will eat or sleep, when and if they will have access to the outdoors, and when they will shower.

34.    By allowing the continued confinement of thousands of individuals under the above conditions, the Defendant has flagrantly failed to minimize the restrictions on the liberty of the individuals on CEPP status, as required by fundamental tenets of due process and human liberty. This failure has profoundly impacted, and continues to impact, the lives of thousands of citizens of this state.  Examples of two such individuals who have been profoundly impacted by their extended stay on CEPP status follow.

10

35.    Carol C. is a 60-year-old woman who was committed to a state psychiatric hospital in 1993. She was on committed status for less than one month when a New Jersey Superior Court Judge determined that she could be discharged to a community placement. Upon information and belief, Carol C. remained continuously on CEPP status from 1993 to March 2005. During most of that time, she remained in the most restrictive and volatile ward of the hospital; other patients assaulted her on numerous occasions, and she required emergency medical treatment at the local general hospital emergency room for such injuries.

36.    While needlessly hospitalized since 1993, Carol C. was unable to participate in the activities she enjoyed, such as supported employment, attending church, and enjoying shopping in local stores.

37.    Another such individual, Brian B., is a 38-year-old male who has been hospitalized in a state psychiatric hospital and on CEPP status since 2003.

38.    Brian wishes to reside in the community, and both a Superior Court Judge and his doctors agree that he is ready for discharge.

39.    He wishes to reside in a group home with his peers, and would enjoy participating in community activities such as musical performances and dances.

40.    He also enjoys cooking and would like to prepare, or assist in the preparation of, his own meals.

41.    He enjoys long walks and trips to the mall.

42.    Brian's mother, who provides moral and emotional support to Brian, believes that he has been institutionalized for too long and looks forward to seeing him reside in the community.

43.    Because there is no appropriate community placement for Brian B., he remains hospitalized in an extremely volatile ward of the hospital, where his safety and security are in jeopardy on a daily basis.

44.    The above examples are merely a few out of the thousands of individuals who are on CEPP status, individuals who are kept in institutions segregated from other citizens unnecessarily and against their will.

## C.    The Failure to Create or Implement an Effective Plan

45.    Since the landmark decision of *Olmstead v. L.C.*, 527 U.S. 581 (1999), states have been required to create and implement a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings.  New Jersey has ignored this important mandate and continued its shameful method of CEPP warehousing and institutional expansion.

46.    In *Frederick L. v. Dept. of Pub. Welfare*, 364 F.3rd 487 (2004), the Court of Appeals for the Third Circuit has held that a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings-- and a waiting list that moves at a

12

reasonable pace and which is not controlled by the state's endeavors to keep its institutions fully populated – is a minimum requirement for states in this Circuit.

47.     New Jersey has neither an effective plan nor a true waiting list, much less one that moves at a reasonable rate. In fact, the DHS's true plan is not to discharge such individuals into the community, but rather to endeavor to keep its institutions fully populated with those individuals.

48.     The percentage of individuals on CEPP status has been and remains consistently high. It is, therefore, an undeniable fact that the state is spending its allocated mental health funds on institutionalizing individuals on CEPP status rather than on developing community placements. In fact, a shockingly large portion of each dollar spent on New Jersey's psychiatric institutions is being spent on individuals who are no longer on committed status and do not belong there.

49.     The dedication of such high dollar amounts to the institutionalization of individuals on CEPP status is exactly the prohibition the court set forth in *Frederick L.* when it proscribed the state's endeavors to "keep its institutions fully populated."

## COUNT I

### Due Process

1.     Plaintiff repeats and realleges each Paragraph of this Complaint as if set forth at length herein.

2.     Defendant's conduct, as described in this Complaint, is carried out under the color and pretense of New Jersey state law.

13

3.    Plaintiff NJP&A's constituents, individuals on CEPP status, by definition cannot be retained under the state's Police Powers because they are not a danger to themselves or others.

4.    The state continues their commitment indefinitely based upon its *parens patriae* powers only.

5.    The state has failed to make good faith efforts to place individuals on CEPP status in the community.

6.    The state does not have the authority to continue confining these individuals indefinitely and without a legitimate and realistic plan for their return to and integration into the community.

7.    These indefinite restrictions on Plaintiff's constituents' liberty without an effective plan to ensure their safe release when they have been deemed suitable to return to the community by a reviewing court deny these constituents their right to due process of law in violation of the Fourteenth Amendment to the United States Constitution. Such rights are enforceable under 42 U.S.C. § 1983.

## COUNT II

### Violation of Article I Section 1 of the New Jersey State Constitution

1.    Plaintiff repeats and realleges each Paragraph of this Complaint, and each Paragraph of Count I above, as if set forth at length herein.

14

2. Plaintiff NJP&A's constituents, individuals on CEPP status, by definition cannot be retained under the state's Police Powers because they are not a danger to themselves or others.

3. The state continues their commitment indefinitely based upon its *parens patriae* powers only.

4. The state has failed to make good faith efforts to place individuals on CEPP status in the community.

5. The state does not have the authority to continue confining these individuals indefinitely and without a legitimate and realistic plan for their integration into the community.

6. These indefinite restrictions on Plaintiff's constituents' liberty without an effective plan to ensure their safe return to the community after they have been adjudicated as suitable to return to the community by a reviewing court deny these constituents their right to due process of law in violation of Article I Section I of the New Jersey State Constitution.

## COUNT III

### Violation of the Americans with Disabilities Act

1. Plaintiff repeats and realleges each Paragraph of this Complaint, and each Paragraph of Counts I and II above, as if set forth at length herein.

2. Plaintiff NJP&A's constituents are individuals with mental illness. They have mental impairments that substantially limit one or more major life activity.

3.     Plaintiff's constituents are qualified individuals with disabilities within the meaning of 42 U.S.C. § 12131(2).

4.     Plaintiff's constituents reside in the state's psychiatric hospitals and have been adjudicated as being ready for discharge into the community through an Order of Conditional Extension Pending Placement. They wish to participate in more integrated community residential programs that meet their mental health needs.

5.     Institutional segregation of such persons who have been deemed able to live in and benefit from community settings perpetuates unwarranted assumptions that persons with mental illness are incapable or unworthy of participating in community life.

6.     Confinement in an institution severely diminishes the everyday life activities of these individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.

7.     In order to receive needed treatment services, Plaintiff's constituents must, because of their disabilities, relinquish the right to participate in community life that they could enjoy, while persons without mental disabilities can receive the services they need without similar sacrifice.

8.     With reasonable accommodations by way of services and supports, Plaintiff's constituents can be served in a suitably integrated setting.

16

9.    Defendant is responsible for the operation of public entities covered by Title II of the ADA. 42 U.S.C.§§ 12131(1)(A) and (B).

10.    Title II of the ADA prohibits Defendants from discriminating against individuals with disabilities in programs and activities. 42 U.S.C. §§ 12131, 12132. Defendant violates these provisions by discriminating against those on CEPP status who are unnecessarily segregated from the larger community.

11.    Title II requires that "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). In the landmark decision *Olmstead v. L.C.*, 527 U.S. 581 (1999), the U.S. Supreme Court held that these provisions of law are violated when a state places people with mental illness in "unjustified isolation," and that a person with mental illness may sue the state for failing to place him or her "in the most integrated setting appropriate to [his or her] needs." *Id.*

12.    The Defendants are obligated under the ADA to administer New Jersey's programs in a manner that supports the availability of services and programs in the most integrated setting for individuals with disabilities.

13.    The Defendant has failed to meet his obligation to provide services and programs in the most integrated setting and instead has kept, and continues to keep, thousands of individuals segregated in state psychiatric hospitals. Psychiatric hospitals are not the most integrated setting appropriate to the needs of persons on CEPP status.

14. The state cannot demonstrate that it has a comprehensive, effectively working plan for placing CEPP patients in less restrictive settings.

15. The state has no rational waiting list that moves individuals on CEPP status into the community at a reasonable pace.

16. The state's continued expansion of the capacity of its institutional psychiatric facilities is evidence that it intends to keep its institutions populated.

## COUNT IV

### Violation of The Rehabilitation Act

1. Plaintiff repeats and realleges each Paragraph of this Complaint, and each Paragraph of Counts I, II, and III above, as if set forth at length herein.

2. Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794

3. Regulations implementing Section 504 of the Rehabilitation Act provide that a

> recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) that have the effect of subjecting qualified handicapped persons to

> discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons . . . .

45 C.F.R. 84.4b(4).

4.      DHS receives federal financial assistance.

5.      Plaintiff's constituents are individuals who reside in institutions and are qualified to participate in more integrated community residential programs that meet their mental health needs.

6.      With reasonable accommodations, Plaintiff's constituents can be served in a suitably integrated setting.

7.      Defendant violates Section 504 of the Rehabilitation Act by failing to administer services to Plaintiff's constituents in the most integrated setting appropriate for them.

8.      Defendant utilizes methods of administering its services that have the effect of subjecting individuals with disabilities to discrimination by keeping them unnecessarily segregated from the community.

9.      Plaintiff's constituents are qualified to participate in more integrated community residential programs that meet their mental health needs.

## COUNT V

### Violation of Patients' Bill of Rights

1.    Plaintiff repeats and realleges each Paragraph of this Complaint, and each Paragraph of Counts I, II, III and IV above, as if set forth at length herein.

2.    It is the public policy of the State of New Jersey that "adequate residential and nonresidential facilities be provided for the prompt and effective diagnosis, care, treatment training and rehabilitation of individuals suffering from diseases and dysfunctions of the brain, mind and nervous system, including the various forms of mental illness and mental retardation;" and that "such facilities be closely integrated with other community health, welfare and social resources." N.J.S.A. 30:4-24(1)&(2).

3.    According to New Jersey state law, every patient in treatment shall be entitled to all rights set forth in the Patient's Bill of Rights.  N.J.S.A. 30:24.2 ("Patient's Bill of Rights")

4.    Plaintiff NJP&A's constituents are "patients in treatment" as intended by the Patient's Bill of Rights.

5.    Among the enumerated rights of Plaintiff NJP&A's constituents is the right to the least restrictive conditions necessary to achieve the purposes of treatment.  N.J.S.A. 30:4-24.2e(2).

20

6.     Also among the enumerated rights of Plaintiff NJP&A's constituents is the right to privacy and dignity.  N.J.S.A. 30:4-24.2c(1).

7.     Also among the enumerated rights of Plaintiff NJP&A's constituents is the right to be free from unnecessary or excessive medication.  N.J.S.A. 30:4-24.2d(1).

8.     Also among the enumerated rights of Plaintiff NJP&A's constituents is the right to be free from physical restraint and isolation, except for emergency situations.  N.J.S.A. 30:4-24.2d (3).

9.     Also among the enumerated rights of Plaintiff NJP&A's constituents is the right to be free from corporal punishment.  N.J.S.A. 30:4-24.2d (4).

10.     As set forth in the Patients' Bill of Rights, Plaintiff NJP&A's constituents are entitled to enforce any of the rights by civil action or other remedies otherwise available by common law or statute.  N.J.S.A. 30:24.2h.

11.     As set forth in the Patients' Bill of Rights, Plaintiff NJP&A's constituents are also entitled to a writ of *habeas corpus* based on violation of these rights.  *Id.*

12.     Defendant violates the public policy of the state as declared in N.J.S.A. 30:4-24 and Defendant violates the Patients' Bill of Rights by failing to administer services to Plaintiff's constituents in the least restrictive conditions necessary to achieve the purposes of treatment.  N.J.S.A. 30:4-24.2e(2).

## COUNT VI

### Violation of New Jersey Law Against Discrimination

1.   Plaintiff repeats and realleges each Paragraph of this Complaint, and each Paragraph of Counts I, II, III, IV and V above, as if set forth at length herein.

2.   New Jersey's Law Against Discrimination ("LAD") makes it unlawful to subject people to differential treatment based on, *inter alia*, mental or physical disability, or perceived disability. *N.J.S.A 10:5-3* (Findings, declarations); *N.J.S.A 10:5-4.* (Obtaining employment, accommodations and privileges without discrimination; civil rights).

3.   The LAD prohibits unlawful discrimination against those with a mental or physical disability in employment, housing, places of public accommodation, credit and business contracts.

4.   In preventing Plaintiff NJP&A's constituents from being integrated into the community, the state denies NJP&A's constituents important advantages in public accommodations.

5.   In preventing Plaintiff NJP&A's constituents from being integrated into the community, the state denies NJP&A's constituents important advantages in publicly assisted housing.

22

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff, New Jersey Protection and Advocacy, Inc., prays for the following relief:

A.    Declaratory and injunctive relief;

B.    An Order requiring that Defendant promptly take such steps as are necessary to enable Plaintiff's constituents to receive services in the most integrated setting appropriate to their needs;

C.    An Order requiring the Defendant to pay a *per diem* monetary penalty for each day beyond the sixtieth day that the state continues to confine individuals deemed by a court to be suitable for return to the community;

D.    An award of prevailing party costs, disbursements and attorney fees pursuant to, *inter alia*, 42 U.S.C § 1988;

E.    An injunction ordering the Defendant to provide monthly reports to the Plaintiff that include information such as the number of individuals on CEPP status, their names, and other information the Plaintiff may require for its federally mandated purposes;

23

F.      Such other relief as the Court deems appropriate.

BY: _____

William Emmett Dwyer (WD 6894)
Attorney for Plaintiff
New Jersey Protection and Advocacy, Inc.
210 South Broad, 3rd Floor
Trenton, NJ 08608


BY: _____

Helen C. Dodick (HD 4960)
Attorney for Plaintiff
New Jersey Protection and Advocacy, Inc.
210 South Broad, 3rd Floor
Trenton, NJ 08608




DATED: April 4, 2005

24

## Certification Pursuant to Rule 201.1(d)

William Emmett Dwyer certifies as follows:

The within civil action is based on an alleged violation of a right secured by the Constitution of the United States.

BY: _____
William Emmett Dwyer (WD 6894)
Attorney for Plaintiff
New Jersey Protection and Advocacy, Inc.
210 South Broad, 3rd Fl.
Trenton, NJ 08608

DATED:  April 4, 2005

## Certification of No Other Action

William Emmett Dwyer certifies as follows:

The within matter is not the subject of any other action pending in any other court and is likewise not the subject of any pending arbitration proceeding or administrative proceeding.

BY: _____
William Emmett Dwyer (WD 6894)
Attorney for Plaintiff
New Jersey Protection and Advocacy, Inc.
210 South Broad, 3rd Fl.
Trenton, NJ 08608

DATED:  April 4, 2005

25