UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF TRENTON

| | | |
|---|---|---|
| DISABILITY RIGHTS NEW JERSEY, INC., a New Jersey Non-profit Corporation,: | : | HON. FREDA L. WOLFSON, U.S.D.J. |
| | : | Civil Action No. 05-1784 (FLW) |
| Plaintiff, | : | |
| v. | : | |
| JENNIFER VELEZ, in her Official Capacity as the Commissioner of New Jersey Department of Human Services | : | **Settlement Agreement** |
| Defendant. | : | |

WHEREAS Disability Rights New Jersey, Inc. ("Plaintiff") brought suit in the above captioned matter against Jennifer Velez, in her capacity as Commissioner of Human Services for the State of New Jersey ("Defendant") (collectively the "Parties"); and

WHEREAS the Parties, through extended negotiations, have determined to resolve this matter; and

WHEREAS the Parties intend through this Settlement Agreement (Agreement) to ensure that individuals who are on conditional extension pending placement ("CEPP") status pursuant to N.J. Ct. R. 4:74-7(h) (2), and in the State psychiatric hospitals, specifically Ancora Psychiatric Hospital, Greystone Park Psychiatric Hospital, Senator Garrett W. Hagedorn Psychiatric Hospital, and Trenton Psychiatric Hospital ("State Hospitals"), will be placed in the community in an appropriate manner within a defined time period; and

WHEREAS this Agreement resolves the claims brought by Plaintiff, including but not limited to 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et*

*seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. §794 ("Section 504") in the above-captioned matter; and

WHEREAS the Parties agree that the resolution of this case is in the best interests of the individuals served in the State Hospitals who are on CEPP status at present and those individuals who will be placed on CEPP status in the future ("Individuals").

NOW THEREFORE, in consideration of the mutual covenants contained herein, the Parties agree as follows:

1. Nothing in this Agreement shall be construed as an acknowledgment, admission, concession, or evidence of liability of either Party regarding any of these claims, including those under the ADA, Section 504, the federal or State Constitutions, or federal or State law, regulations, rules, or policies, and this Agreement may not be used as evidence of liability in this or any other civil or criminal proceeding.

2. Pursuant to Fed. R. Civ. P. 41(a), the Parties will file in the United States District Court for the District of New Jersey, Vicinage of Trenton, this Agreement, together with a notice to conditionally dismiss the Complaint under the conditions set forth in this Agreement. This case will remain on the Court's inactive docket during the term of this Agreement as a means of ensuring compliance of the Parties with the Agreement.

3. The Effective Date of this Agreement shall be the date it is filed with the United States District Court, Vicinage of Trenton, and, unless otherwise specified, all time periods contained in this Agreement shall commence on that date.

4. Any action, task, or provision of services Defendant agrees to undertake in this Agreement shall mean that Defendant has agreed to undertake that action, task, or provision of services in keeping with "professional judgment" as defined by *Youngberg v. Romeo*, 457 U.S. 307

(1982). To the extent any provision of this Agreement relating to undertaking an action, task or delivery of services requires that any action be taken or thing be done to a level of quality or in an amount that is not otherwise specified or quantified in the Agreement, or that is described as "reasonable" or "appropriate," such provision shall be interpreted to mean that level, quality, amount, or timeliness of care, treatment, or services that is consistent with "professional judgment" as enunciated in *Youngberg*.

5. Defendant shall substantially comply with all of the requirements of this Agreement. Substantial compliance shall mean that Defendant is complying with the material requirements of this Agreement. Isolated instances of non-compliance shall not preclude a finding of substantial compliance. In addition, a finding of non-compliance shall not be made in situations where an Individual was timely offered appropriate community placement consistent with Paragraph 8(B)(IV)(d), but the Individual's desire to wait for a specific community placement or change of mind regarding community placement causes delay in placement beyond the time frames set forth in Paragraph 8.

6. The Parties agree that a court's judgment that an Individual is on CEPP status means that the Individual has been adjudicated ready for discharge, but that there is no appropriate and available community based placement. Such judgment by a court cannot be supplanted by a contrary determination by the State's treating professionals. Nothing in this Agreement shall limit or prohibit the State or its officials or employees from seeking commitment or recommitment of any Individual consistent with New Jersey statutes, regulations, and court rules.

7. This Agreement obligates Defendant to have and implement a plan for community placement ("Plan") whose purpose, as further described in this Agreement, is to address how to

accomplish the timely placement of all Individuals in the State Hospitals into the community in the most integrated settings appropriate to their needs. The Plan must comply with the requirements of Paragraph 8. The Parties agree that at the time of the filing of this Agreement, the "Home to Recovery-CEPP Plan: Plan to Facilitate the Timely Discharges of CEPP Patients in New Jersey's State Psychiatric Hospitals," dated January 2008, and produced in discovery as State Document # 907 (Bates No. S54900 - S54978) ("Home to Recovery"), meets the requirements for the Plan as set forth in Paragraph 8 of this Agreement except that the numerical and percentage goals and time frames set forth in Paragraph 8 shall supersede those set forth in Home to Recovery. Any future Plan or modifications to Home to Recovery must also meet the requirements set forth in Paragraph 8 of this Agreement. Before making any material modifications to the Plan or to Home to Recovery, Defendant will consult with Plaintiff. If Plaintiff believes that any modification to the Plan or to Home to Recovery constitutes a breach of the Agreement, Plaintiff may institute the dispute resolution process set forth in Paragraph 18.

8. The Plan shall include the following elements:

   A. Creation of RIST, Supportive Housing, PACT and Specialized Housing as follows:

| | Total Placements to be Created | Placements to be Created for Individuals on CEPP | Placements to be Created for the Prevention of Institutionalization |
|---|---|---|---|
| FY2010 | 230 | 180 | 50 |
| FY2011 | 215 | 145 | 70 |
| FY2012 | 145 | 95 | 50 |
| FY2013 | 225 | 125 | 100 |
| FY2014 | 250 | 150 | 100 |
| | 1065 | 695 | 370 |

   B. Targets for numbers or percentages of Individuals to be placed in the community are as follows:

I. For the 297 Individuals who were placed on CEPP before July 1, 2008:

   a. In FY2010, placement of 110 of the 297 Individuals;

   b. In FY2011, placement of 95 of the 297 Individuals;

   c. In FY2012, placement of 60 of the 297 Individuals;

   d. In FY2013, placement of 32 of the 297 Individuals;

   e. In FY2014, placement of all of the 297 remaining Individuals, if any.

II. Placement of all Individuals into community placements who were placed on CEPP after 7/1/2008 as follows:

   a. For Individuals who do not have "Legal Status" as defined, *infra,* (Non-legal Status Individuals), as of the end of FY2014:

     i. 95% of Non-legal Status Individuals will be placed within 4 months or less of being placed on CEPP; and

     ii. The remaining 5% of Non-legal Status Individuals will be placed within 9 months or less of being placed on CEPP.

   b. The targets for Non-legal Status Individuals will be phased in over 5 years as follows:

     i. By the end of FY2010:  placement of 62% of Non-legal Status Individuals within 6 months or less of being placed on CEPP;

     ii. By the end of FY2011:  placement of 68% of Non-legal Status Individuals within 6 months or less of being placed on CEPP;

     iii. By the end of FY2012:  placement of 77% of Non-legal Status Individuals within 4 months or less of being placed on CEPP;

     iv. By the end of FY2013:  placement of 85% of Non-legal Status Individuals within 4 months or less of being placed on CEPP;

     v. By the end of FY2014:  placement of 95% within 4 months or less of being placed on CEPP and placement of the remaining 5% within 9 months of being placed on CEPP.

   c. For Individuals who have "Legal Status" (Legal Status Individuals), as of the end of FY2014:

     i. 95% of Legal Status Individuals will be placed within 6 months or less of being placed on CEPP; and

        ii. The remaining 5% of Legal Status Individuals will be placed within 12 months or less of being placed on CEPP.

    d. The targets for Legal Status Individuals will be phased in over the five years as follows:

        i. By the end of FY2010: placement of 62% of Legal Status Individuals within 6 months or less of being placed on CEPP;

        ii. By the end of FY2011: placement of 68% of Legal Status Individuals within 6 months or less of being placed on CEPP;

        iii. By the end of FY2012: placement of 77% of Legal Status Individuals within 6 months or less of being placed on CEPP;

        iv. By the end of FY2013: placement of 85% of Legal Status Individuals within 6 months or less of being placed on CEPP;

        v. By the end of FY2014: placement of 95% of Legal Status Individuals within 6 month or less, and placement of the remaining 5% within 12 months or less of being placed on CEPP.

III. While Plaintiff believes that Individuals can be placed in a shorter period of time than the time frames set forth, *supra*, Defendant believes that these time frames are essential for placing some Individuals, and the Parties have agreed to them for purposes of settlement only.

IV. For the purposes of placements under this Agreement:

    a. The following terms are defined as follows:

        i. Legal Status shall mean Individuals who:

           (1) are required to register under Megan's Law, N.J.S.A. 2C:7-1, et seq.; or

           (2) have an unresolved immigration status; or

           (3) have a history of offenses or dispositions by a court, of one of the following:

              (a) N.J.S.A. 2C:11-3 Murder;

              (b) N.J.S.A. 2C:11-4 Manslaughter;

              (c) N.J.S.A. 2C:14-2 Aggravated Sexual Assault, Sexual Assault;

              (d) N.J.S.A. 2C:14-3 Criminal Sexual Contact;

       (e) N.J.S.A. 2C:15-1(a) Robbery 1st Degree;

       (f) N.J.S.A. 2C:12-1(b) 1,2,3,4,7 Aggravated Assault;

       (g) N.J.S.A. 2C:17-1 or N.J.S.A. 2C:17-2  Aggravated Arson, Arson;

       (h) N.J.S.A. 2C:13-1 Kidnapping; or

       (i) A crime in another jurisdiction that is similar to one of the listed crimes.

ii. History of one of the listed crimes in Paragraph 8(IV)(a)(i)(3) shall mean that the Individual was:

    (1) First committed by a court pursuant to N.J.S.A. 2C:4-4 (incompetent to stand trial) of one of the crimes;

    (2) First committed by a court pursuant to N.J.S.A. 2C:4-8 (not guilty by reason of insanity) of one of the crimes;

    (3) committed in lieu of being released following completion of a sentence to prison of one of the crimes;

    (4) adjudicated delinquent for one of the crimes or the equivalent in the juvenile justice code; or

    (5) convicted of one of the crimes.

iii. Key Principles of Supportive Housing  shall mean  permanence, affordability, choice, flexible supports, and community integration, and shall include the "Housing First" philosophy and approach described in Home to Recovery at page 29 In this approach, rental housing is provided upfront and is not contingent upon participation in treatment, rehabilitation or other services, and is not time-limited.  Needed services, such as mental health or substance abuse treatment, rehabilitation, peer support, skills and resource development, are provided as wraparound services and both supplement and promote the consumer's successful housing retention.   Permanence is

reflected in lease-based or similar occupancy agreement type arrangements. Affordability requires tenants to pay in rent a specified portion of their income. Support services are accessible, flexible and promote housing stability. Housing promotes community integration and may be single scattered sites, clustered or shared settings.

iv. Supportive Housing shall mean housing that incorporates the Key Principles of Supportive Housing and follows the traditional supportive housing model of access to affordable, lease-based housing linked with flexible support services. Housing opportunities are developed accessing various sources of funding and attempt to meet consumer preference. Housing is lease-based (or similar occupancy agreement) and consumers pay a specified portion of their income towards rent.     Support services are provided and may include assistance with moving and settling into a new home and neighborhood; rehabilitation services such as skills development in areas of daily living, socialization, financial literacy; assistance with medication and illness self-management; and peer support. Providers are encouraged to design programs that allow for flexible service delivery to meet the varying needs of consumers as they change over time. Housing settings can include individual units or shared living.

v. RIST shall mean an enriched supportive housing model that incorporates the Key Principles of Supportive Housing and allows for greater staff-to-consumer ratios for increased intensity and frequency of support services. This approach to intensive residential support is flexible in design and mobile.

Consumers are full partners in planning their own care and support service needs, who identify and direct the types of activities which would most help them maximize opportunities for successful community living. Staff support is provided through a flexible schedule which may be adjusted as consumer needs or interests change. RIST encourages consumer use of other community mental health treatment, employment and rehabilitation services, as needed and appropriate.

vi. PACT, as defined more fully in N.J.A.C. 10:37J-1.1, shall mean a service model that provides comprehensive, integrated rehabilitation, treatment and support services to persons with serious and persistent mental illness who have had repeated hospitalizations and who are at serious risk for psychiatric hospitalization. PACT, provided *in vivo* by a multi-disciplinary service delivery team, is the most intensive program element in the continuum of ambulatory community mental health care. Services to a person may vary in type and intensity. Treatment has no predetermined end point.

vii. Integrated Case Management Services (ICMS) shall mean a collaborative outreach program designed to engage, support and integrate people with serious mental illness into the community and facilitate their use of available resources and supports in order to maximize their independence.

viii. Specialized Housing shall mean housing and specialized services for Individuals with co-existing medical conditions requiring in-home support, challenging behaviors that respond to behavioral shaping or tailoring services, or other such additional conditions or needs requiring staff specifically skilled

to address such needs. Settings are typically shared housing or clustered settings and often involve new housing development. Specialized Housing shall incorporate the Key Principles of Supportive Housing to the extent practicable.

b. The length of time an Individual is on CEPP status shall be calculated from the date of the most recent court order that placed the Individual on CEPP status. In other words, if an Individual is placed on CEPP status, remains on CEPP status for a period of time, and is then recommitted pursuant to N.J. Ct. R. 4:74-7(f)(1), either while on CEPP status or following a discharge to the community, the prior time on CEPP status shall not be included in any future calculation of time on CEPP status. A "placement review hearing" pursuant to N.J. Ct. R. 4:74-7(f)(2), in which an Individual's present CEPP status is continued, does not constitute the "most recent court order that placed the Individual on CEPP status."

c. The community placements provided to Individuals pursuant to the Plan shall be either in (i) community service capacity that shall be developed, consistent with the Key Principles of Supportive Housing, or (ii) existing community service capacity placements that are either under contract to the Department of Human Services or generally available to Individuals. All such placements in existing community service capacity under contract to the Department of Human Services shall incorporate, to the extent practicable, the Key Principles of Supportive Housing. For all placements in generally available community service capacity Defendant shall offer appropriate community mental health services to support the living arrangement, usually PACT or ICMS. Nothing in the Agreement shall

prevent an Individual from being discharged, when appropriate, to his or her own home, the home of a relative or a friend, or a living situation arranged and/or chosen by the Individual or his or her family or friends. In those situations, Defendant shall offer appropriate community mental health services to support the living arrangement.

d.  The community placement(s) provided to an Individual shall be the most integrated placement appropriate to the Individual's needs, taking into account the Individual's preferences, the location of the Individual's family and other natural supports, the availability of appropriate services, and the reasonableness of the placement in light of the cost of similar placements and other relevant factors consistent with the Supreme Court's decision in *Olmstead v. L.C.,* 527 U.S. 581 (1999). Defendant shall ensure that whenever possible, Individuals are offered a meaningful choice of community placements.

V.  Individuals Who Refuse Any Community Placement:

a.  In the event Defendant offers an Individual a placement in accordance with this Agreement and the Individual clearly and knowingly refuses the placement because the Individual does not wish to be placed in any community setting, Defendant shall be considered to have complied with the time frames related to this Individual and any statistics regarding Paragraph 8 targets shall incorporate this compliance.

b.  If the Individual clearly and knowingly refuses to be placed in the community, the reasons underlying the Individual's preference shall be addressed by the Individual's treatment team and other appropriate employees of Defendant.

"Clearly and knowingly" refusing to be placed in the community means that the Individual:

i.   has had an opportunity to express his or her preferences;

ii.  has been informed of community alternatives and the recommended community placement in a manner that reflects the Individual's ability to understand and communicate information; and

iii. is provided the opportunity to visit and observe community settings of the type recommended, unless the Individual's treatment team determines that such a visit would be clinically inappropriate.

c.   For Individuals who refuse to be discharged to any community placement, Defendant shall ensure that the Individual's State Hospital treatment team or other appropriate staff of Defendant continue to discuss discharge planning with and recommend appropriate community placement options with specific types of providers to the Individual at each of his or her treatment team meetings and at other appropriate times and continue to assess whether the Individual continues to clearly and knowingly refuse to be placed in the community.  In addition, the Individual's treatment team shall continue to offer the Individual additional opportunities to visit and observe community settings of the type recommended, unless the Individual's treatment determines that such a visit would be clinically inappropriate.

d.   An Individual who previously clearly and knowingly refused to be placed in any community setting may inform a member of the treatment team or any other appropriate staff person of Defendant that he or she now wishes to be placed in

the community. When an Individual does so, the date that the Individual notifies a member of the treatment team or other appropriate State Hospital staff that he or she wishes to be placed in the community shall be, for purposes of the Agreement, the equivalent of the date on which the Individual was placed on CEPP.

C. A description of the steps Defendant will take to meet the goals and objectives set forth in Paragraph 8 and in the Plan and Home to Recovery.

D. Provisions for appropriate education as to community placement, community service options, community capacity, and community placement process for appropriate DHS, DMHS, and State Hospital staff, Individuals, their guardians (when applicable), family members of Individuals (when appropriate), and/or other appropriate groups identified;

E. Provisions for continued implementation of appropriate assessment tools and procedures to determine what services are needed to support Individuals in the community; and

F. Provision(s) for thorough periodic review of all potential funding sources for the Plan, and effective action to access those sources, including action to maximize appropriate Medicaid funds and action to reallocate DMHS funds, taking into account savings from State Hospital census reduction and other appropriate factors.

9. Defendant shall comply with the requirements set forth in Paragraph 8 as well as the principles set forth in the Plan itself and in Home to Recovery. Defendant's obligation to comply with the numerical and percentage goals and time frames set forth in Paragraph 8 is subject to the limitations in Paragraphs 14, 15, 16, 17, and 18.

10. The Parties have jointly agreed that Defendant shall retain Martha Knisley, Ph.D., as a Consultant for the purposes of making recommendations for further development and implementation of the Plan, including the development and financing of additional units of

supportive housing. The Consultant shall be involved in planning for the education, training, and mentoring of the professionals (psychiatrists, psychologists, social workers, and others) at the State Hospitals and at the DMHS who will be expected to bring the practices of their professionals and the DMHS into alignment with best practices and compliance with the goals, time frames, and other requirements in this Agreement.

A. The Consultant shall have ready access to the reports provided pursuant to Paragraph 13, all documents underlying those reports, all documents related to implementation of the Plan and Home to Recovery, and any other information the Consultant considers necessary to perform her functions under the Agreement. The Consultant shall also have ready access to Individuals, with their consent, and to Defendant's staff and facilities. The Consultant shall execute a confidentiality agreement with the same provisions as the confidentiality agreement required by Paragraph 13(C).

B. DMHS, Plaintiff and the Consultant shall have a quarterly conference call to discuss the status of the Consultant's work with DMHS. This quarterly conference call may be waived by the Parties if Plaintiff, DMHS, and the Consultant all agree it is not necessary.

C. The Consultant shall keep Plaintiff and its representatives apprised of the status of her work. The Consultant may speak separately with either Party or its representatives. The Consultant shall have the discretion to determine whether information she learns or discusses in a separate discussion with one Party shall be kept confidential from the other Party. In exercising such discretion, the Consultant shall not compromise her obligation to keep Plaintiff and its representatives apprised of the status of her work.

D. The Consultant shall be retained for three years from the date she is retained unless the Parties agree to discontinue the use of the Consultant before then or to extend the use of the Consultant thereafter.

E. Defendant shall bear all costs of the Consultant; however, the annual costs for the Consultant shall not exceed a total of $55,000 in the first year, $45,000 in the second year and $35,000 in the third year.

F. In the event it becomes necessary to replace Dr. Knisley, the identity of the new Consultant shall be jointly agreed to by both Parties as follows:

   I. Each Party shall submit the name, *curriculum vitae*, and contact information of at least one proposed Consultant to the other within 15 days of receiving notice of the need for a new Consultant.

   II. The Parties shall have 30 days from the date of receiving notice of the need for a new Consultant to determine the identity of the new Consultant based on those proposed or if that has not occurred by the thirtieth day, each Party shall submit the name, *curriculum vitae*, and contact information of at least one other proposed Consultant.

   III. If the Parties have not agreed on the identity of the Consultant after 30 days from the date of receiving notice of the need for a new Consultant, the Parties agree to mediate the matter for 15 days. The Parties, by mutual agreement in writing, may extend the 15 day mediation time frame.

   IV. If the Parties have not agreed on the identity of the Consultant after 45 days from the date of receiving notice of the need for a new Consultant, the Parties agree to have the Court determine the identity of the Consultant.

V. The three-year term of the Consultant shall be extended by the amount of time the Consultant position remained vacant during the search for a replacement.

11. Defendant shall create an ongoing Olmstead workgroup for the period of the Plan's implementation. This workgroup shall provide ongoing policy and practice advice to the State Hospitals and the DMHS as the Plan is implemented. At the workgroup meetings, data on implementation and difficult implementation issues will be discussed, along with specific cases, as necessary to continue implementation. Key DMHS and State Hospital staff, a representative of DRNJ, or its successor, and the Consultant shall be among the permanent members of the workgroup. Other participants may be invited by Defendant to meetings depending on the topic at hand.

12. Defendant shall develop and/or enhance and implement assessment tools, data systems and tools, and other processes, as necessary, to implement the Plan.

13. Defendant shall provide reports to Plaintiff and the Consultant as follows:

   A. Three periodic reports, to be delivered on December 1, March 1, and June 1 of each year of the Agreement. The December 1 report shall cover July, August, and September. The March 1 report shall cover October, November and December. The June 1 report shall cover January, February and March. Each report shall contain the following information:

   I. For each resident on CEPP status during the reporting period: Name, client ID number, gender, name of State Hospital and unit, date of birth, county of residence, date of most recent admission to the facility, date placed on CEPP status, and if the resident has been discharged during the reporting period, date of discharge, and type of placement to which the person was discharged.

II. The total number and percentage of Individuals who have been on CEPP status at each State Hospital and across all State Hospitals for less than or equal to 1 month, between 1 and 2 months, between 2 and 3 months, between 3 and 4 months, between 4 and 5 months, between 5 and 6 months, between 6 and 9 months, between 9 and 12 months, between 12 and 24 months, 2-5 years, and more than 5 years after being placed on CEPP status. Updates of the information (in the same format) provided in State Documents 1044 and 1045 produced in discovery will suffice to provide the information required by this paragraph.

III. The average length of time that CEPP residents have been on CEPP status at each State Hospital, and the average length of time that CEPP residents have been on CEPP status across all State Hospitals.    Updates of the information (in the same format) provided in State Document 1046 produced in discovery will suffice to provide the information required by this paragraph.

IV. The number of Individuals who have been discharged from each State Hospital during the reporting period:

 a. broken down by type of placement to which they were discharged; and

 b. broken down by the number discharged after total length of stay in the State Hospital of less than 3 months, between 3 and 6 months, between 6 and 9 months, between 9 and 12 months, between 12 and 24 months, 2-5 years, and more than 5 years from date of admission to the State Hospital.

V. During the reporting period, complete information tracking rates of community placement of Individuals, broken down by percentage discharged in less than or equal to 1 month, between 1 and 2 months, between 2 and 3 months, between 3 and 4

months, between 4 and 5 months, between 5 and 6 months, between 6 and 9 months, between 9 and 12 months, between 12 and 24 months, 2-5 years, and more than 5 years after being placed on CEPP status. Updates of the information (in the same format) provided in State Document 1045 produced in discovery will suffice to provide the information required by this paragraph.

VI. During the reporting period, complete information tracking the extent to which Defendant is meeting the numerical and percentage goals and time frames for community placement set forth in the Plan and this Agreement. Such information shall include data tracking the extent to which those numerical and percentage goals and time frame results reflect Individuals who have refused a placement pursuant to Paragraph 8(B)(V), the number of such Individuals, the reasons for the refusals, and efforts undertaken by Defendant to identify and address any clinical and/or systemic concerns related to such refusals. Such information shall also include data tracking the extent to which those numerical and percentage goals and time frame results reflect Individuals whose preference or change of mind regarding community placement have caused delays in placement pursuant to Paragraph 5, the number of such Individuals, the reasons for such preferences or changes of mind, and efforts undertaken by Defendant to identify and address any clinical and/or systemic concerns related to such delays in placement.

VII.    For each State Hospital, the gross patient census, number of admissions, and the number of discharges made each month in the reporting period.

B. An Annual Report by October 1 of each year, beginning on October 1, 2010, that covers the periodic information for April, May and June, as well as the entire State Fiscal Year, that contains the following information:

   I. For each resident on CEPP status during the reporting year:  Name, client ID number, gender, name of State Hospital and unit, date of birth, county of residence, date of most recent admission to the facility, date placed on CEPP status, and if the resident has been discharged during the reporting period, date of discharge, and type of placement to which the person was discharged.

   II. During the reporting year, the total number and percentage of Individuals who have been on CEPP status at each State Hospital and across all State Hospitals for less than or equal to 1 month, between 1 and 2 months, between 2 and 3 months, between 3 and 4 months, between 4 and 5 months, between 5 and 6 months, between 6 and 9 months, between 9 and 12 months, between 12 and 24 months, 2-5 years, and more than 5 years after being placed on CEPP status.  Updates of the  information (in the same format) provided in State Documents 1044 and 1045 produced in discovery will suffice to provide the information required by this paragraph.

   III. During the reporting year, the average length of time that CEPP residents have been on CEPP status at each State Hospital, and the average length of time that CEPP residents had been on CEPP status across all State Hospitals.  Updates of the information (in the same format) provided in State Document 1046 produced in discovery will suffice to provide the information required by this paragraph.

   IV. During the reporting year, the number of Individuals who have been discharged from each State Hospital:

a.  broken down by type of placement to which they were discharged; and

b.  broken down by the number discharged after total length of stay in the State Hospital of less than 3 months, between 3 and 6 months, between 6 and 9 months, between 9 and 12 months, between 12 and 24 months, 2-5 years, and more than 5 years from date of admission to the State Hospital.

V. During the reporting year, complete information tracking rates of community placement of Individuals, broken down by percentage discharged in less than or equal to 1 month, between 1 and 2 months, between 2 and 3 months, between 3 and 4 months, between 4 and 5 months, between 5 and 6 months, between 6 and 9 months, between 9 and 12 months, between 12 and 24 months, 2-5 years, and more than 5 years after being placed on CEPP status. Updates of the information (in the same format) provided in State Document 1045 produced in discovery will suffice to provide the information required by this paragraph.

VI. During the reporting year, complete information tracking the extent to which Defendant is meeting the numerical and percentage goals and time frames for community placement set forth in the Plan and this Agreement. Such information shall include data tracking the extent to which those numerical and percentage goals and time frame results reflect Individuals who have refused a placement pursuant to Paragraph 8(B)(V), the number of such Individuals, the reasons for the refusals, and efforts undertaken by Defendant to identify and address any clinical and/or systemic concerns related to such refusals. Such information shall also include data tracking the extent to which those numerical and percentage goals and time frame results reflect Individuals whose preference or change of mind regarding community

placement have caused delays in placement pursuant to Paragraph 5, the number of such Individuals, the reasons for such preferences or changes of mind, and efforts undertaken by Defendant to identify and address any clinical and/or systemic concerns related to such delays in placement.

VII.    For each State Hospital, the gross patient census, number of admissions, and the number of discharges made each month during the reporting year.

VIII.    Average annual cost per placement type and cost to the State per Individual based upon the discharge plan during the reporting year and for the time period from the Effective Date of the Agreement to the date of the report, broken down by type of placement and by the following expense categories: (1) all program costs, including costs of multiple programs if the Individual is engaged in more than one program upon discharge; and (b) rental assistance subsidy. Defendant maintains that DMHS does not collect consumer-specific data on other ancillary funds that help support the cost of community care (e.g., medication, primary healthcare, room and board not otherwise supported by a rental assistance subsidy). Average cost per placement for the program cost and rental assistance subsidy will be the average for all consumers using the program, regardless of whether they were on CEPP prior to being placed.

IX. Total annual expenditures made by DMHS during the reporting year:

a.  for placements made pursuant to the Plan during the time period covered by the report and to date, broken down by type of placement;

b.  of State Legislature's "*Olmstead*" appropriation to implement Plan during the time period covered by the report and during the time period from the Effective Date of the Agreement to the date of the report;

X. Sources and amounts of federal and State funding, in addition to the State Legislature's "*Olmstead*" appropriation, expended for community placements pursuant to the Plan during the time period covered by the report and during the time period from the Effective Date of the Agreement to the date of the report. The parties agree that DMHS shall report aggregate Medicaid revenue per program and shall not report  consumer specific information about Medicaid reimbursed funding.  The parties agree that DMHS shall not report data on other ancillary funds that help support the cost of community care (e.g., medications, primary health care, room and board not otherwise supplied by a rental assistance subsidy);

XI. Complete information reflecting the status of efforts to secure additional Medicaid and other sources of funding to implement the Plan, including efforts to reallocate DMHS funds;

XII.    The sources and amount of and plan for the expenditure of the annual available funds to be used to implement the Plan in the upcoming year;

XIII.    Complete information reflecting the effect of the Plan on the State Hospitals' census, State Hospital unit consolidations and closures, the amount of any savings realized therefrom, the amount of any such savings that have been used to implement the Plan in the reporting year, and the amount of any such savings that will be used to implement the Plan in the upcoming year.

XIV.    Documents providing updates of the information (in the same format)  provided in State Documents 1042,.

XV.    Documents providing updates of the information provided in State Documents 1047.

XVI. Documents providing updates of the information provided in State Documents 1048.

C. The information in all reports required by Paragraphs 13(A) and (B) shall be treated as confidential to the extent that it comes within the terms of the confidentiality agreement attached to this Agreement as Exhibit A; however, the Parties shall not treat information as confidential that does not fall within the scope of the confidentiality order in this matter.

D. In the event that the Defendant determines to change the format of reports referred to in Paragraph 13(A) and (B), the new format shall contain the same categories of information as the referenced State Documents and Defendant shall notify Plaintiff prior to making the change(s).

E. The Parties shall meet within two weeks after submission of the second quarter report and the annual report of each year of the Agreement, or sooner if requested, to discuss any issues arising out of the report.

14. Funding of the Plan

A. Defendant asserts that its ability to meet the numerical and percentage goals and time frames set forth in Paragraph 8 is subject to appropriation of funding by the New Jersey Legislature. For State Fiscal Year 2010, the Governor proposed a budget that includes $5 million for implementation of Defendant's numerical and percentage goals and time frames for FY2010, as set forth in Paragraph 8. Defendant believes that amount is sufficient to meet those numerical and percentage goals and time frames. In each subsequent year of this Agreement, Defendant agrees to request and seek as one of the Department's top priorities that the Governor submit, as part of the annual budget

recommendations, an amount sufficient to continue meeting the numerical and percentage goals and time frames set forth in Paragraph 8. Defendant asserts, however, that while Defendant will seek as one of the Department's top priorities an amount sufficient to continue meeting the numerical and percentage goals and timeframes set forth in Paragraph 8, the Governor, upon receiving various agencies' budget requests and top priorities, has the sole discretion to determine which of those agencies' budget priorities will be included in his budget for a given fiscal year and if included, at what level of funding. Furthermore, to the extent that the Governor includes funding at any level for this Agreement in his future budgets, Defendant asserts that the Legislature is not bound by the Governor's proposal in determining the level of funding. Therefore, Defendant asserts that it cannot guarantee the amount of funding that will be appropriated in subsequent fiscal years in order to implement the numerical and percentage goals and time frames set forth in Paragraph 8. The Parties agree that to the extent that (i) the Governor does not submit a budget with sufficient funds to enable Defendant to meet the numerical and percentage goals and time frames set forth in Paragraph 8, (ii) the Legislature does not appropriate sufficient funds to enable Defendant to meet the numerical and percentage goals and time frames set forth in Paragraph 8, or (iii) the Governor requires Defendant to reduce spending during the fiscal year such that Defendant may not have sufficient funds to meet the percentage goals and time frames set forth in Paragraph 8, Plaintiff and Defendant shall institute the applicable process set forth in Paragraphs 15 and 16, and Plaintiff shall be limited to the remedies set forth in Paragraph 16(C).

B. Defendant has closed four units at the State Hospitals since April 1, 2005, due to reductions in the census of the State Hospitals, specifically, one of the Mountain Meadow Cottages at Greystone Park Psychiatric Hospital and three units at Ancora Psychiatric Hospital, and intends to continue to make adjustments to State Hospital operations to realize savings in operations.

   I. Annually, as part of each annual report submitted pursuant to Paragraph 13(B), Defendant will provide to Plaintiff a three-year projection of anticipated census of the State Hospitals. In developing the projection, Defendant will consider whether and to what extent State Hospital units can be closed and savings can be realized as a result of the discharges of people on CEPP status pursuant to this Agreement. Defendant shall propose as part of DHS's annual appropriations request, referred to in and subject to Paragraph 14(A), that the savings that can be realized from census reduction in the upcoming year be appropriated for the purpose of developing or supporting the community mental health system.

   II. Consistent with N.J.S.A. 30:4-177.54 *et seq.* and N.J.A.C. 10:10-1 *et seq.*, Defendant shall take such actions as she is authorized to take to ensure that as a mental health facility closes or has a greater than 50 percent reduction in census, all funds are redirected to services in the community, thereby increasing the State's financial support of community mental health services for its citizens. Defendant will provide Plaintiff a copy of the annual report prepared pursuant to N.J.A.C. 10:10-2.1(e), as soon as it is ready.

   III. The Parties agree that (1) the annual census projections referred to in Paragraph 14(B) are not a commitment by Defendant to achieve the projected census reduction; and

(2) although Defendant will take significant steps to divert unnecessary admissions, Defendant does not have absolute control over admissions to, and hence demand for State Hospital beds, and as such, the census may not decrease every year.

15. In the event that either (i) Defendant concludes that an annual appropriation is insufficient to meet the numerical and percentage goals and time frames set forth in Paragraph 8, or (ii) Defendant is ordered to reduce spending such that funds may not be available to meet the numerical and percentage goals and time frames set forth in Paragraph 8, the following shall occur:

A.  Defendant shall notify Plaintiff in writing within the first three months of the fiscal year or within 20 business days of being ordered to reduce spending.  In that writing, Defendant shall identify the amount of funds available, describe in detail the plan for expenditure of the available funds to continue implementation of the Plan at a reasonable pace, and specify the resulting impact on the numerical and percentage goals and time frames set forth in Paragraph 8.  Defendant shall include with that notice all underlying documents it is relying on to support its assertions.  If Defendant does not provide the requisite notice set forth in this Paragraph, then Defendant may not assert insufficiency of funding by the Governor or Legislature as a defense to any allegation of breach during the particular fiscal year at issue.

B.  The Parties shall meet within 20 business days of this notification to discuss the amount of funds available and the plan for expenditure of these funds to continue implementation of the Plan at a reasonable pace and the resulting effect on the numerical and percentage goals and time frames set forth in Paragraph 8  At that meeting, Defendant shall provide all additional underlying documents it is relying on to support its assertions.  Only if both

Parties agree that such a meeting will not resolve the matter, may they agree in writing to waive this meeting and proceed accordingly.

C.  If, at the meeting, the Parties do not come to an agreement as to how Defendant will proceed to implement the Plan at a reasonable pace, Plaintiff shall have 30 days to institute the Dispute Resolution Process set forth in Paragraph 18 and remedies set forth in Paragraph 16(C). The Parties may agree in writing to extend the time frame for instituting the Dispute Resolution Process if they believe additional time is needed to confer in an attempt to come to an agreement.

D.  If Plaintiff does not institute the Dispute Resolution Process set forth in Paragraph 18 and Remedies set forth in Paragraph 16(C) within 30 days of the meeting held pursuant to Paragraph 15(B) and (C) or such other time as the Parties have agreed to pursuant to Paragraph 15(C), or if the Parties have agreed to waive the meeting, then within 30 days of receiving Defendant's notice pursuant to Paragraph 15(A), Plaintiff will have agreed that Defendant's revised plan for expenditure of the available State funds contained in the notice sent pursuant to Paragraph 15(A) and Defendant's execution of that plan shall constitute compliance with this Agreement for that fiscal year and that the numerical and percentage goals and time frames set forth in Paragraph 8, shall be adjusted accordingly, which may have the effect of requiring the Parties to agree to extend this Agreement in accordance with Paragraph 25.

16. The remedies in this Paragraph shall be the only remedies if (i) Plaintiff asserts that there are not sufficient State funds to meet the annual numerical and percentage goals and time frames for community placement; (ii) Plaintiff asserts that Defendant has failed to meet the annual numerical and percentage goals and time frames for community placement and Defendant

asserts that it does not have sufficient funds and Defendant has complied with Paragraphs 15 (A) and (B); or (iii) Defendant has asserted that there are not sufficient funds to meet the annual numerical and percentage goals and time frames for community placement and Defendant has complied with Paragraphs 15 (A) and (B).

A. The Party invoking the terms of Paragraph 16 shall do so by sending a written notice to the other Party stating the factual basis for doing so, information supporting that assertion and whether the assertion arises under Paragraph 16(i), (ii) or (iii).

B. If Plaintiff has invoked the terms of Paragraph 16(i) and Defendant has not had the opportunity to invoke the process set forth in Paragraph 15(A), Defendant shall do so within 20 days.  The Parties shall follow the process set forth in Paragraph 15 (A) to (D).

C. If the matter is not resolved as a result of the process in Paragraph 15 (A) to (D), then this entire Agreement shall be void and Plaintiff may either:

    I. reinstitute this lawsuit at any time within 45 days after the dispute resolution process has been exhausted.  Plaintiff may only invoke the remedy in Paragraph 16(C)(I) during State Fiscal Years 2010 and 2011; or

    II. file any other litigation. If Plaintiff exercises its right to void this Agreement and files other litigation, Defendant shall not object to the filing of such other litigation pursuant to L.Civ.R. 40.1(c) (D.N.J.).  In any such other litigation, discovery produced in the present action may be used and shall be admissible at trial to the same extent as it would have been used or admissible in the present action.

D. Nothing in this Agreement shall be construed to limit any of Defendant's defenses, and specifically, Defendant may raise insufficient appropriations as a defense to the reinstituted or other litigation filed by Plaintiffs.

17. Remedies for Breach

A. In the event either Party asserts that the other has breached any provision of this Agreement, the non-breaching Party may invoke the Dispute Resolution Process set forth in Paragraph 18. It shall not be considered a breach, however, and the process and remedies in Paragraphs 15 and 16 shall be the only available process and remedies in the situations set forth in Paragraph 16 (i), (ii), and (iii). If the Dispute Resolution Process set forth in Paragraph 18 does not resolve the dispute and after providing fourteen (14) days written notice to opposing counsel, the party asserting breach shall file, within 45 days of the written notice of intent to file the motion, a motion to enforce the Agreement, before the United States District Court for the District of New Jersey, which shall retain jurisdiction in order to resolve any such disputes. The motion shall be supported by a certification that the Dispute Resolution Process set forth in Paragraph 18 did not resolve the dispute under this Agreement.

B. As part of a motion to enforce, the movant may seek an order extending the Agreement due to respondent's failure to substantially comply with the Agreement.

C. Nothing in this Agreement shall be construed to limit the Defendant's defenses and specifically, Defendant may raise insufficient appropriations as a defense, in any motion to enforce the agreement or action for breach.

18. The following shall be the Dispute Resolution Process:

A. Either party may invoke the Dispute Resolution Process in accordance with the terms of this Agreement by sending a written notice to the other party stating the factual basis of the dispute, citing the portion of this Agreement that authorizes the party to invoke the Dispute Resolution Process, and including information supporting the assertion. The

other party shall make a written response that includes information supporting its assertions within 10 business days of receipt of the invoking party's notice and supporting information.

B. From the date of receipt of the written response and supporting information, the Parties shall negotiate in good faith for 30 business days in an attempt to resolve the dispute unless the time is extended by written agreement of the Parties.

C. If the Parties do not resolve the dispute through negotiations within 30 business days, the Parties shall agree to mediate the matter for 30 days on terms to be agreed upon and placed in writing by the Parties. The Parties, by mutual agreement in writing, may extend the 30-day mediation time frame.

D. Each Party has proposed the name of a candidate to serve as the Mediator. The parties shall have 30 days from the effective date of this agreement to respond to the other Party's proposal. Thereafter, the parties shall have 30 days to reach an agreement as to the identity of the Mediator.

E. The Mediator shall execute a confidentiality agreement with the same provisions as required in the confidentiality agreement in Paragraph 13(C).

F. In the event that during the term of the Agreement, Mediator agreed upon by the parties pursuant to Paragraph 18(D) can no longer serve as the Mediator, the Parties shall use the same process set forth in Paragraph 10(F) for replacement of the consultant, to replace the Mediator.

G. Defendant shall pay all costs of the mediation.

19. The information in all reports required by Paragraphs 14, 15, 16, 17 and 18 shall be treated as confidential to the extent that it comes within the terms of the confidentiality agreement

executed by the parties and attached as Exhibit A; however, the Parties shall not treat information as confidential that does not fall within the scope of the confidentiality agreement in this matter.

20. The Parties agree that Defendant shall pay Plaintiff $850,000.00 in full satisfaction of all attorneys' fees and costs that Plaintiff has incurred in this litigation.

21. All notices and reports to be sent pursuant to this Agreement shall be sent by U.S. Mail, return receipt requested or by hand delivery with a signed confirmation, to:

| For Plaintiff: | For Defendant: |
|---|---|
| Executive Director<br>Disability Rights New Jersey,<br>or its successor<br>210 South Broad Street, 3rd Floor<br>Trenton, New Jersey 08608 | Commissioner<br>New Jersey Department<br>of Human Services<br>PO Box 700<br>Trenton, New Jersey 08625-0700 |
| Director of Litigation<br>Disability Rights New Jersey,<br>or its successor<br>210 South Broad Street, 3rd Floor<br>Trenton, New Jersey 08608 | Assistant Commissioner<br>New Jersey Division<br>of Mental Health Services<br>P.O. Box 727<br>Trenton, New Jersey 08625-0727 |

22. Defendant at all times shall remain bound to comply with applicable New Jersey and federal law.

23. This Agreement is enforceable only by the Parties and is binding upon the Parties, by and through their officials, agents, employees, and successors. The Parties do not intend that this Agreement shall create a private right of action in any civil, criminal or administrative action in any person. Nothing in this Agreement is intended to divest any person(s) of any other private right of action they may possess pursuant to State or federal law. No other person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity

other than the Parties may assert any claim or right as a beneficiary or protected class under this Agreement in any civil, criminal, or administrative action.

24. This Agreement may not be altered, amended, or modified except by writing duly executed by all of the undersigned Parties or their successors in interest.

25. The Agreement shall automatically terminate sixty days after Plaintiff's receipt of Defendant's final Annual Report, due October 1, 2014, pursuant to Paragraph 13(B), without the need for any action on behalf of any party, unless (i) the Parties have agreed in writing to extend the Agreement beyond that date; or (ii) either Party has invoked the Dispute Resolution Process before that date and the dispute at issue has not yet been resolved; or (iii) the Court has ordered an extension of the Agreement pursuant to Paragraph 17(A). If none of these three exceptions exist, the Parties agree that no court or other tribunal shall have the power to extend the Agreement past the automatic termination date.

26. This Agreement is enforceable only by the Parties and is binding upon the Parties, by and through their officials, agents, employees, and successors.

27. This Agreement supersedes any previous agreements, oral or written, between the Parties and shall constitute the entire, integrated Agreement of the Parties. No prior contemporaneous communications, oral or written, or prior drafts shall be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding.

28. This is a mutually binding Agreement.

29. This Agreement may be executed and delivered in several counterparts, each of which when so executed and delivered shall constitute an original, fully enforceable counterpart for all purposes.

By their signatures, each Party signing this Agreement represents and warrants that the signatory

is authorized to execute this Agreement

For Plaintiff:

_____
Joseph Young
Executive Director
Disability Rights New Jersey, Inc.


_____
Date

For Defendant:


Jennifer Velez
Commissioner
New Jersey Department of Human Services


July 28, 2009
Date

ANNE MILGRAM
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey  08625
Attorney for Jennifer Velez, Commissioner
    of the Department of Human Services

By:  Beth Leigh Mitchell
    Deputy Attorney General
    (609) 599-6869

    Gerard Hughes
    Deputy Attorney General
    (609)777-4854

    Laurie M. Tompkins
    Deputy Attorney General
    (609) 292-6120

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF TRENTON

| | | |
|---|---|---|
| DISABILITY RIGHTS NEW JERSEY, INC. A New Jersey Non-profit corporation<br>    Plaintiff,<br><br>    v.<br><br>JENNIFER VELEZ, In her Official Capacity as Commissioner of Human Services for the State of New Jersey,<br>        Defendant. | : : : : : : : : | HON. FREDA WOLFSON, U.S.D.J<br><br>Civil Action No. 05-1784 (FLW)<br><br><br>CONFIDENTIALITY AGREEMENT |

WHEREAS, Disability Rights New Jersey, Inc. (Plaintiff) brought suit in the above captioned matter against Jennifer Velez,

EXHIBIT A

in her capacity as Commissioner of Human Services for the State of New Jersey (Commissioner); and

WHEREAS, a Discovery Confidentiality and Protective Order (Protective Order) was filed with the court on March 6, 2006 and signed by the Honorable Tonianne J. Bongiovanni, U.S.M.J., attached hereto as Exhibit 1.

WHEREAS, the Parties executed a Settlement Agreement on July 28, 2009, resolving all claims in this matter; and

WHEREAS, this case will remain on the Court's inactive docket during the term of the Settlement Agreement; and

WHEREAS, it is anticipated that pursuant to the Settlement Agreement, the Commissioner may disclose records, which were considered confidential under the March 6, 2006, Protective Order; and

WHEREAS, pursuant to the Settlement Agreement, the Commissioner may determine to disclose records, which would be deemed privileged pursuant to the December 19, 2007, Letter Order of the Honorable Tonianne Bongiovanni, U.S.M.J., including but not limited to intra-agency discussions, budgetary requests and draft documents, or pursuant to another recognized privilege; and

WHEREAS, the Parties desire to both continue the terms of the March 6, 2006, Protective Order, and to extend confidentiality to records which would which would be deemed privileged pursuant to the December 19, 2007, Letter Order of the Honorable Tonianne

Bongiovanni, U.S.M.J., including but not limited to intra-agency discussions, budgetary requests and draft documents, or pursuant to another recognized privilege;

NOW THEREFORE, the Parties consent and agree to the following terms of this Confidentiality Agreement:

1. Confidential material shall mean

   a.   any material that is confidential pursuant to the March 6, 2006 Protective Order; and

   b.   records which would be deemed privileged pursuant to the December 19, 2007, Letter Order of the Honorable Tonianne Bongiovanni, U.S.M.J., including but not limited to intra-agency discussions, budgetary requests and draft documents, or pursuant to another recognized privilege;

2.   The designation of Confidential Material may be made by the producing party by conspicuously stamping or otherwise placing or affixing on documents that are (or contain or refer to) Confidential Material the word "Confidential," on the front page of the document.

3.   The parties shall not further reproduce, copy or otherwise disseminate Confidential Material to any person or agency for any other reason, nor disseminate or make public the records by any

Page 3 of  7

means, direct or indirect, other than to the aforesaid attorneys or those individuals or groups identified in the Settlement Agreement.

    4.   All Confidential Material released to the Parties as part of fulfillment of the Settlement Agreement:

        a.   shall be kept strictly confidential and shall not be used by any Party, employees of a Party or a Party's attorneys of record, for any purpose other than the purposes of the Settlement Agreement; and

        b.   may not be disclosed to any other persons except for the Parties, employees of a Party, a Party's attorneys of record, the mediator and consultant appointed pursuant to the Settlement Agreement, and all other persons to whom disclosure is permitted pursuant to paragraphs 4 and 5 of the Protective Order (Exhibit 1).

    5.  Any person to whom Confidential Material is to be disclosed, other than those identified in Paragraph 4, and including the mediator and consultant under the Settlement Agreement, shall first sign a confidentiality agreement with the same terms as the instant Agreement.

    6.   The Parties agree that disclosure of confidential material as defined in paragraph 1(b) under this agreement does not constitute waiver of the deliberative process privilege or other privilege.

7.  No later than sixty (60) days after the expiration of the Settlement Agreement, all Confidential Material provided by the Commissioner pursuant to the Settlement Agreement and previously provided solely pursuant to the March 6, 2006 Protective Order, including all copies made for any reason, shall either be returned to Anne Milgram, Attorney General of New Jersey, through Beth Mitchell, Deputy Attorney General, or certified to have been destroyed at the expiration of the Settlement Agreement as set forth by 45 C.F.R. §164.512(e)(1)(v)(B), whether or not the Confidential Material is confidential pursuant to 42 U.S.C.A. §1320d et seq. (HIPAA), and its underlying regulations 45 C.F.R. 160 and 164 (HIPAA Privacy Rule).

8.  In the event that a good faith dispute arises regarding whether information is properly designated as Confidential Material, such that it is subject to the terms of this Confidentiality Agreement, the party disputing the assertion of confidentiality shall provide the producing party with a written statement setting forth the basis upon which the challenge to the assertion of confidentiality is based.  Within fifteen (15) business days of receipt of such written statement, the party producing shall either:

    a.  withdraw the assertion of confidentiality; or

b.   file a motion seeking to have the Court determine whether the information is confidential pursuant to the claimed authority.    In any such motion the producing party shall have the burden to prove that such information is confidential and each party shall bear its own costs.

9. In the event that a good faith dispute arises regarding whether an individual identified pursuant to Paragraphs 4 and 5 of this Confidentiality Agreement shall be required to keep the Confidential Material confidential pursuant to this Confidentiality Agreement, the party challenging the need for the individual to abide by this Confidentiality Agreement shall provide the other party with a written statement of the basis upon which it is believed that the identified individual need abide by the Confidentiality Agreement.  Within fifteen (15) business days, the party asserting that the identified individual must keep the information confidential shall either:

a.   withdraw the request to identify the individual as someone who must keep the Confidential Material confidential under the terms of this Confidentiality Agreement; or

b.   file a motion seeking to have the court determine whether the individual is someone who must keep the information confidential pursuant to the terms of

Page 6 of  7

this Confidentiality Agreement.  In any such motion
the Party asserting the individual is someone who
must abide by this Confidentiality Agreement shall
have the burden to prove that such information is
confidential and each Party shall bear its own
costs.

We, the undersigned, hereby consent
and agree to the terms of
this Confidentiality Agreement:

On behalf of Plaintiff,
Disability Rights New Jersey, Inc.

_____         7/29/09
Emmett Dwyer, Esq.                         DATE

On behalf of Jennifer Velez, Commissioner
of the Department of Human Services

    ANNE MILGRAM
    ATTORNEY GENERAL OF NEW JERSEY

by:  _____    7/29/2009
     Beth Leigh Mitchell                   DATE
     Deputy Attorney General

Page 7 of  7

ZULIMA V. FARBER
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey  08625
Attorney for Kevin Ryan,
     Acting Commissioner, New Jersey
     Department of Human Services

By:  Beth Leigh Mitchell (BLM0651)
     Deputy Attorney General

     Gerard Hughes (GH6680)
     Deputy Attorney General
     (609) 633-8197

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF TRENTON

| | | |
|---|---|---|
| NEW JERSEY PROTECTION AND ADVOCACY, A New Jersey Non-profit corporation | : | HON. STANLEY R. CHESLER, U.S.D.J |
|     Plaintiff, | : | Civil Action No. 05-1784 (SRC) |
| v. | : | DISCOVERY CONFIDENTIALITY AND PROTECTIVE ORDER |
| JAMES DAVY, In his Official Capacity as Commissioner of Human Services for the State of New Jersey, | : | |
|     Defendant. | : | |

WHEREAS this matter is a contested matter filed in the United States District Court for the District of New Jersey and venued in the Vicinage of Trenton; and

WHEREAS, it is anticipated that The State of New Jersey, Department of Human Services (hereinafter "the State") may have to

**EXHIBIT 1**

disclose records which may contain protected health information within the meaning of the Health Insurance Portability and Accountability Act, Administrative Simplification, 42 U.S.C.A. §1320d et seq. and its underlying regulations, 45 C.F.R. 160 and 164 (HIPAA Privacy Rule), generally, and specifically 45 C.F.R. 164.512(e), which provides that protected health information may be provided in a judicial proceeding where a protective order has been entered into; and

WHEREAS, it is anticipated that the State may have to disclose records in the custody of Department of Human Services, Division of Mental Health Services which may contain confidential information pursuant to N.J.S.A. 30:4-24.3, which can only be disclosed where a court has ordered same pursuant to N.J.S.A. 30:4-24.3(c) and the Court having found that non-disclosure of records that the State will produce pursuant to discovery in this litigation would be contrary to the public interest; and

WHEREAS, it is anticipated that New Jersey Protection and Advocacy, Inc. ("NJP&A") may have to disclose records that contain sensitive and confidential information including but not limited to medical conditions/treatment of NJP&A's constituents and/or records that are protected from disclosure under 42 U.S.C. §10806.

WHEREAS, it is anticipated that third parties may have to disclose records that contain sensitive and confidential

information    including    but    not    limited    to    medical
conditions/treatment; and

WHEREAS, the parties consent and agree to the terms, form and
entry of this Discovery Confidentiality and Protective Order
("Order") on the following terms and for good cause shown;

IT IS, therefore, on this 6th day of March, 2006, ORDERED
that:

1.    All confidential material set forth above and produced
subject to the terms of this Order shall be termed "Confidential
Material."  The designation of Confidential Material may be made by
the producing party by conspicuously stamping or otherwise placing
or affixing on documents produced that are (or contain or refer to)
Confidential Material the words "Confidential."

2.  The parties shall not further reproduce, copy or otherwise
disseminate Confidential Material to any person or agency for any
other reason, nor disseminate or make public the records by any
means, direct or indirect, other than to the aforesaid attorney, or
the court having jurisdiction of the action except as specified in
this Order; and

3.    All Confidential Material released to the parties as part
of discovery pursuant to this Order:

-3-

a.   shall be kept strictly confidential pursuant to HIPAA
Privacy Rule and shall not be used or disclosed for any
purpose other than the trial preparation in the above-
captioned mater, as specified in this Order, for which
this information was requested as required by HIPAA
Privacy    Rule    and    specifically    45    C.F.R.
§164.512(e)(1)(v)(A); and;

b.   may not be disclosed to any other persons except for the
parties, the attorneys of record for the parties and
members of their law firms/organizations, or to persons
regularly employed in such law firms/organizations'
offices, or in accordance with the limitations set forth
in paragraph 5, to certain other persons as reasonably
necessary for the preparation or trial of this matter.

5.   In addition to those persons listed in paragraph 4, the
following persons may be given access to Confidential Material when
reasonably necessary for the conduct of this litigation:

a.   Expert witnesses and consulting experts.

b.   Court reporters involved in taking depositions in
this case.

c.   Non-party witnesses, but only in the course of, and
to the extent necessary to conduct, depositions or
interviews of such witnesses.

-4-

     d.   Persons who were authors of the Confidential Material, or who were previous recipients of the Confidential Material.

     e.   Such other persons as may be identified in the course of the litigation and as agreed between counsel for the parties.

6.   Any such person to whom Confidential Material is to be disclosed pursuant to this Order shall first be advised by the attorney making the disclosure that pursuant to this Order such person may not divulge any such Confidential Material to any other person not authorized hereunder to have access to such Confidential Material, and may not use such Confidential Material for purposes unrelated to this litigation and the reason for the disclosure in the course thereof. The attorney shall secure from each person an affidavit stating that such person has read this Order and agrees to be bound by it. Such affidavit shall be maintained in the possession of the attorney securing the affidavit until further order of the Court. Court reporters and deposition witnesses may satisfy this requirement by noting their agreement on the record;

7.   No later than sixty (60) days after the conclusion of this litigation (including exhaustion of all appeals and/or petitions for certiorari), all Confidential Material provided by the State pursuant to this Order, including all copies made for any reason, shall either be returned to Zulima V. Farber, Attorney General of

-5-

New Jersey, through Beth Leigh Mitchell, Deputy Attorney General, or certified to have been destroyed at the completion of this legal proceeding as required by the HIPAA Privacy Rule, 45 C.F.R. §164.512(e)(1)(v)(B).

8.  No later than sixty (60) days after the conclusion of this litigation (including exhaustion of all appeals and/or petitions for certiorari), all Confidential Material provided by NJP&A pursuant to this Order, including all copies made for any reason, shall either be returned to NJP&A or Pepper Hamilton LLP, or certified to have been destroyed at the completion of this legal proceeding.

9.  To the extent that any of the Confidential Material is to be used as evidence in the above captioned matter, the party introducing such Confidential Material shall file a motion to seal pursuant to L. Civ. R. 5.3(c).

10.  In the event that a good faith dispute arises regarding whether information is properly designated as Confidential Material, such that is subject to the terms of the Order, the party disputing the assertion of confidentiality shall provide the producing party with a written statement setting forth the basis upon which the challenge to the assertion of confidentiality is based.  Within fifteen (15) business days of receipt of such written statement, the producing party shall either:

     a.  withdraw the assertion of confidentiality; or

-6-

b.  file a motion seeking to have the Court determine whether the information is confidential pursuant to the claimed authority.    In any such motion the producing party shall have the burden to prove that such information is confidential.

11.  In the event that a good faith dispute arises regarding whether an individual identified pursuant to paragraph 5(e) of this Order shall be required to keep the Confidential Material confidential pursuant to this Order, the party challenging the need for the individual to abide by this Order shall provide the other party with a written statement of the basis upon which it is believed that the identified individual need abide by this Order. Within fifteen (15) business days, the party asserting that the identified individual must keep the information confidential shall either:

a.  withdraw the request to identify the individual as someone who must keep the Confidential Material confidential under the terms of this Order; or

b.  file a motion seeking to have the Court determine whether the individual is someone who must keep the Confidential Material confidential pursuant to the terms of the this Order.    In any such motion the party asserting that the individual must abide by

-7-

the terms of this Order shall have the burden to so prove.


_____ s/ Tonianne J. Bongiovanni _____
Hon. Tonianne Bongiovanni, U.S.M.J.


We, the undersigned, hereby
consent and agree to the terms,
form and entry of this Order:


Pepper Hamilton, LLP,


_ s/ Jeffrey A. Carr _____          _ 2/28/06 _____
Nicholas M. Kouletsis                          Date
Jeffrey A. Carr
on behalf of Plaintiff, New Jersey
Protection and Advocacy, Inc.


ZULIMA V. FARBER
ATTORNEY GENERAL OF NEW JERSEY


_ s/ Beth Leigh Mitcehll _____          _ 2/28/2006 _____
Beth Leigh Mitchell                            Date
Deputy Attorney General
on behalf of Kevin Ryan,
Acting Commissioner, New Jersey
Department of Human Services


-8-